## Gabriel v. Gabriel.

*Divorce—Cruelty—Indignities—Evidence—Adultery by libellant.*

1. When a man and woman have been married in early youth and for a period of more than twenty years have succeeded in making the many mutual adjustments necessary to married life, it should take an unusually strong case to justify the court, when the parties have arrived at the afternoon of life, in granting a divorce.

2. A libel filed by the husband, alleging cruel and barbarous treatment and indignities to his person by his wife, will be dismissed where the case is based upon a great number of unconnected trivial incidents extending over a period of more than twenty years of married life, and upon the occasional use of opprobrious epithets and six or seven acts of personal violence which did not endanger his life and which were separated from one another by several years.

3. Where the libellant testifies to certain incidents of his married life tending to show cruel and barbarous treatment and indignities to his person by the respondent, and is corroborated by occasional visitors at his home who merely testify in general terms that there was much quarreling between libellant and respondent, and that the latter was guilty of nagging, and the incidents are denied by the respondent and she is corroborated by their daughter who lived with them and by the domestic servants, libellant's testimony is practically uncorroborated by any one likely to know the truth, and he has failed to sustain the burden of proof.

4. Although adultery on the part of the libellant is not a defence to an action in divorce for cruel and barbarous treatment and indignities to the person, yet, where libellant has denied the incidents upon which such charge is based and they are overwhelmingly established by the weight of the evidence, they become important, as in such case they seriously and even fatally impeach his credibility and show what may well be inferred to be the real motive for his seeking a divorce.

Exceptions to master's report. C. P. No. 2, Phila. Co., March T., 1921, No. 764, in Divorce.

*William H. Wilson*, for libellant; *Otto Robert Heiligman*, for respondent.

STERN, J., Oct. 8, 1923.—The record in this case is unreasonably voluminous. There are 2610 pages of testimony. Considering that Carlyle's History of the French Revolution is less bulky, one would think that the matrimonial troubles of the Gabriels could have been told in more condensed language, and that the delinquencies even of a Messalina or a Lucretia Borgia could be depicted in less volume than counsel have seen fit to employ in the present case.

The libellant and respondent were married on April 22, 1899. The libellant was then twenty-four years old; his wife, the respondent, was twenty-eight years of age. He is now forty-eight, and she is fifty-two. They have one child, a daughter, twenty-three years of age.

The libellant's action for divorce is based on allegations of cruel and barbarous treatment and indignities to the person. The master has found that these charges are substantiated by the testimony, and accordingly has recommended that a decree of divorce be granted, to which recommendation the respondent has filed exceptions.

It is evident upon reading the testimony that the libellant has combed the history of his marital career with a very fine comb indeed. He left the domestic hearth on Dec. 24, 1920, and there seems to have occurred no incident during the preceding twenty-one years of his marital life that has escaped his remembrance. In analyzing the testimony one must be careful to remember the stretch of years over which the incidents therein recorded occurred, because when grouped together they present a graver aspect than when each of the incidents recorded is placed in its historical perspective. One or more years elapsed between the occurrences of the various events which constitute

the libellant's grievances, and with that in mind the cumulative effect of their recital is considerably weakened.

Some of the incidents narrated by the libellant are so meticulously trivial as not to warrant serious consideration. For example, he complains that in May, 1899, a month after the marriage, he asked his wife on one occasion for coffee, but she refused to indulge him in his desire for that beverage, and instead gave him a plate of strawberries to eat. On Christmas Day of 1900, she expressed the thought that he had not given to her as nice Christmas presents as he might have done, and that she was sorry she had not married another man who had paid her attentions. Three years later, she objected to his taking out life insurance, saying that she thought it would be better if he spent the money for the expenses of running the household. During the year 1908 they attended a party at the Bingham Hotel in Philadelphia, during the course of which she threw at him across the table a small bun or pieces of bread crumbs, which struck him in the eye—an occurrence which he relates with great pretence of seriousness and with much circumstantial detail. This incident is typical of many others as far as the libellant's attitude in the case is concerned. There does not appear to have been any quarrel between the libellant and respondent immediately preceding or at the dinner, and from the testimony and one's reasonable interpretation of what occurred, it is easy to picture a group of merry revelers at a large dinner party, at which pieces of bread are tossed around the table in playful fashion, and no one attributing any seriousness to the incident until it becomes linked up twelve or fifteen years later as part of a chain designed to form the basis of a suit for divorce. So, too, the libellant complains of his wife's aggressive views on suffrage in the days when women's suffrage was a matter of public controversial concern, of an occasion when she left the home for a day or two without previously telling him where she was going, and of a number of other comparatively trivial happenings which might be picked out by any husband or wife in reviewing a long marital history, if disposed to be carping and critical.

We pass, therefore, to what might be termed the more serious charges preferred by the libellant, and first among these is the alleged fact that on many occasions she called him opprobrious names, such as "loafer," "blockhead," "bum" and some German appellations which probably gain or lose much of their force by translation into the vernacular. As far as this phase of the case is concerned, it is sufficient for the present to point out that apparently these epithets were employed by the respondent, for the most part at least, in the privacy of their own conversations; that there is, therefore, no pretence of any real embarrassment to which the libellant was subjected by such occurrences in public; that the libellant himself admits that he was not always as delicate and kindly in his speech as an ideal husband might well be; and, finally, that one gains the impression from the testimony that these parties are of a plain, jolly stock and not to be judged by the amenities and social usages which are supposed to prevail in the most cultured and refined of social circles.

The libellant further urges that his wife nagged him, and that she was of a more or less quarrelsome temperament, which tended to make his life an unhappy one. A nagging disposition, although not uncommon, is one that any man would naturally seek to avoid in selecting a life companion. But "nagging" is an extremely vague term, and mere loquacity or quarrelsomeness on the part of a wife is not a ground for divorce. To these reflections it may be added that the testimony would seem to indicate that here, too, the husband was not faultless. If his wife quarreled with him, it is equally true that he

3 D. & C.

Gabriel v. Gabriel.

also quarreled with his wife, and the evidence would not warrant the inference that her nagging rose to such a degree as to stamp her a shrew, who placed herself as such beyond the pale of a reasonably civil and properly organized domestic environment.

We now come to those incidents of which the libellant complains in the nature of attempts at physical violence. The libellant says that in 1908 the respondent threw a candlestick at him, striking him on the arm; that in 1910 she struck him with her fists while he lay in bed; that in 1911 she threw some eggs at him; that in 1914 she threw at him a saltcellar, pepper-box, mustard pot and catsup bottle; that in 1915 she threw at him a bottle of gin, and on another occasion tossed her wedding ring at his feet; that in 1917 she "choked" him while he was asleep, and that in 1920 she caught hold of his throat. The alleged events thus recapitulated form what probably is intended to be the "piece de resistance" of the libellant's case, and thus grouped together they do bear on their face an unpleasant aspect. When it is considered, however, that years elapsed between each of the occurrences complained of, and that none of them, when the testimony is read, appears to be as really serious as their bare recital might imply, or other than, at best, the manifestations of petulant temper rather than deliberate attempts to inflict injury, they lose much of their import. This is particularly true when the version of these occurrences given by the respondent is considered, because she either denies or so explains each of them as to force on one the conviction that what in reality were comparatively unimportant quarrels have been magnified by the libellant, taken from their respective settings, and made to appear as though premeditated or deliberate attempts on the part of the respondent to inflict upon the libellant bodily harm.

One of the most dramatic events in the married life of the parties was the attempted suicide of the respondent, and the libellant makes much of it. It appears that on one occasion, in the fall of 1914, the respondent went into her room and turned on the gas, and had she not been rescued she would have died then and there. It seems strange that the libellant should seek to utilize this event as one upon which to base his claim for a divorce. An attempt at suicide would seem to indicate that the person who resorts to it is, in his or her own belief, hopelessly unhappy, and such an attempt must be viewed with sympathy rather than as a grievance or wrong to another or others. It would appear more natural to suppose from the fact that it was the wife who sought to commit suicide that the husband was making her life unhappy rather than that it was the respondent who was impairing the happiness of her husband.

In addition to the charges already discussed, there are a few others upon which the libellant depends. He says, for example, that the respondent was careless with the health of their child at a time in 1908 when the latter had an attack of measles, and that this resulted in the child becoming deaf. This charge is not substantiated by any other testimony, but, on the contrary, is clearly indicated to be baseless. He further complains that his wife did not desire any more children and insisted on his taking measures to prevent an increase in the family; that on one occasion in 1915, upon coming home in the evening, he found his wife on the porch in a semi-conscious condition, and that in 1915 she made a trip to Florida for a few weeks without telling him that she was going away.

It is believed that the above covers all of the grievances claimed by the libellant. His case consists, in short, of a number of incidents or events stretching out over the twenty-one-year period during which he lived with his wife, and the court is of the opinion that, even assuming for the moment

that the libellant's version of these happenings is correct, they would not entitle him to a divorce on the ground of cruel and barbarous treatment or indignities to the person. The husband left the household at the end of 1920, although, even according to his own testimony, practically all of the matters of which he complains had occurred years before. When a man and woman have married in early youth, and for a period of almost a quarter of a century have succeeded to some fair degree in making the necessary mutual readjustments which married life demands and in weathering the inevitable storms which brew wherever two human beings live in close proximity to one another, it should take an unusually strong case to justify a court, when the parties have arrived at the afternoon of life, in granting a divorce severing the marital ties that over so long a period have bound them together.

Divorce cases rest largely upon their individual facts, and the citation of authorities is, therefore, not as helpful in them as in many others. It may be pertinent, however, to quote from the opinion of Mr. Justice Henderson in Altwater *v.* Altwater, handed down by the Superior Court on July 12, 1923 [81 Pa. Superior Ct. 359], in which a somewhat similar state of facts is thus dealt with by that tribunal:

"The reading of the evidence of the appellant gives the impression that the facts on which he relies are described in extravagant terms and are multiplied by the repetitions indulged in. The cruelty alleged and prominently displayed in the evidence consisted of an attempt to throw a plate at the libellant and a threatening demonstration by the respondent with a butcher knife. There was also evidence by the complainant and his sister that the respondent had struck the former with her fist. These occurrences seem to have taken place about two years or more before the complainant separated from his wife. The acts described evidently did not put the appellant in fear, nor were the physical demonstrations of such violence or repeated occurrence as under the circumstances would warrant a decree of divorce. . . . As the complainant continued to live in the same house and occupied the same room with his wife for about two years after the occurrences relied on, the assumption is reasonable that his separation was not the result of the urgency of his experience in the matter of the alleged assaults. . . . It is doubtless true that the respondent is a person of 'quick temper,' who takes affront easily, but this is an infirmity of nature which the law does not recognize as a ground for divorce, and this may be also said of the nagging disposition charged. Domestic disputes which so frequently arise are not made a cause of divorce unless they have the magnitude and importance of actual personal violence, or the reasonable apprehension of it, or such indignities to the person as to render one's condition intolerable and life burdensome, and that is something more than the annoyance of a frivolous disposition and susceptibility to sudden anger or a failure at times to exercise an affectionate disposition."

Thus far we have considered the case as though by way of demurrer to the libellant's testimony; that is to say, accepting it as true. The court, however, rests the real reason for its view of the present case upon the fact that it disagrees with the master in his recommendations as to findings of fact. The respondent tells an entirely different story from that narrated by her husband. Most of the incidents to which he refers, as above set forth, are denied by her as having taken place, while others are put in so different a light as to render them wholly innocuous. The master was, therefore, confronted, as is now the court, by the question as to whether the husband or the wife is to be believed in their respective versions. The master found in all aspects of the case in favor of the libellant. Was he correct in so doing? We think not.

3 D. & C.

In the first place, the husband is practically uncorroborated in his testimony. It is true that he produced several witnesses, namely, Mr. and Mrs. John H. Baizley, Mr. and Mrs. Peter C. Rickmers, Mrs. Genevieve Miller, Mrs. Harriett C. Doolittle and Miss Emma Gabriel, his sister, all of whom, however, testified, with the exception of the Bingham Hotel incident, in the most general terms, and merely to the effect that there was much quarreling between the parties and that the respondent was guilty of nagging. None of these persons was other than an occasional visitor at the Gabriel home. On the other hand, the respondent produced not only persons of this same type, as, for example, Mr. and Mrs. Robert W. Walls, Mrs. Emma F. Wilson, Mrs. Carrie R. Bisbee, Mr. and Mrs. Martin C. Furstenau and Mrs. Elizabeth K. Groben, but also the daughter of the parties, Gabrielle Gabriel, a next-door neighbor, Mrs. Augusta Bach, and two persons who were domestic servants in the home, Margaret Reckenberg and Theresa Abel, all of whom bear witness to the truth of the respondent's side of the case. The master seems to have overlooked the fact that these latter persons—the daughter, the domestic servants and the neighbor—were the witnesses best able to throw light upon the controversy. The daughter, according to all the testimony, was apparently devoted to her father. They are said to have been the closest of "pals;" nevertheless, her testimony is wholly in favor of the respondent, and tends strongly to negative the claim that it was the latter who was at fault, or that she had the unpleasant mannerisms and the tendencies to violence as contended by the libellant. The same is to be said of the testimony of the two domestics, while the next-door neighbor denies the libellant's assertion that the respondent quarreled with him and called him names. In other words, eliminating the evidence of the witnesses who were merely occasional visitors, we have here a case of the husband claiming one set of facts and the wife another, and the only other persons in the household, namely, the servants and the daughter, all testifying in behalf of the respondent, thus leaving the libellant's testimony practically uncorroborated by any one likely to be in a position to know the truth. Apposite to the situation, therefore, are the remarks of Mr. Justice Henderson in Altwater v. Altwater, *supra*, as follows: "The indignities to the person described in the evidence consisted of abusive epithets alleged to have been applied by the respondent to the libellant and some of his relatives, the continued and excessive use of intoxicating liquor, the exhibition of a violent temper in the presence of the libellant and other persons, and the indulgence in a nagging disposition toward the libellant. As in the case of the charge of cruelty, the case depends to a very large degree on the testimony of the complainant and his sister. The use of abusive language is strongly denied by the respondent, and other members of the household who had an opportunity to observe the domestic life of the parties support her denial." And the court goes on to point out that "the burden was on the complainant to establish a case by clear and satisfactory evidence," and the divorce was refused. So, also, in Heckman v. Heckman, likewise decided by the Superior Court on July 12, 1923 [81 Pa. Superior Ct. 370], the court said, per Mr. Justice Trexler: "The proof offered by the libellant is to the effect that the wife continually nagged him, called him vile names, tore his clothes, spit in his face, used obscene language, falsely accused him of commerce with other women, threatened suicide, caused him to neglect his business, was inattentive to him in every way, failed to perform marital duties, and used drugs. The master found all these facts in libellant's favor, accepting throughout his testimony as true and giving no credence to the respondent's. As to many of the accusations, it was the husband's oath against his wife's.

His testimony runs smoothly; the wife is always at fault and he is a model of patience and fidelity. Everything that appears against him is flatly contradicted. The wife seems to have some restraint in testifying and admits certain occurrences which are unfavorable to her. She says she did on three occasions threaten to commit suicide, but she was nervous and overworked, and the last occasion was when she learned of the intimacy existing between her husband and his stenographer. According to his testimony, they led a cat and dog life. She scolded long and loud. Strange to say, the neighbors testified that Mrs. Heckman had a well-ordered house, that they heard no disturbance or observed anything unusual, and that the parties apparently lived together amicably, took walks and went to church and everything seemed to be all right. . . . Trivial incidents are exaggerated. . . . Considering the case in all its aspects, we do not think the libellant's proof is so clear as to warrant a divorce." In short, the court is of the opinion in the present case that the weight of the testimony is strongly with the respondent, and that it is her version of the facts which should be accepted as being true.

In addition to the reasons for this conclusion already pointed out, there is another which is of transcendent importance. In the course of the cross-examination of the libellant, the following testimony appears (pages 81-82) : "Q. There can be no doubt, Mr. Gabriel, that from the time you moved to Wolf Street up until the present time, that you have lived at the Manufacturers' Club, with the exception of the nights that you were away on your business trips and other instances that you cited—is that correct? A. Yes, sir. Q. Mr. Gabriel, you stated that you were always a dutiful and faithful husband to your wife—is that correct? A. Yes, sir. Q. And gave her no provocation for . the alleged misconduct that you have recited? A. Never. Q. And that you have always been a true and faithful husband to your wife during your married life? A. Absolutely." And again (page 204) : "Q. By the way, Mr. Gabriel, have you ever been known by any other name besides Joseph C. Gabriel? A. No, sir. Q. You never signed yourself by any other name? A. No, sir. Q. At any time? A. At any time. Q. You are positive of that? A. Absolutely." And again (pages 236-240) : "Q. Mr. Gabriel, I am going to ask you again, have you ever been known by any other name other than the name of Joseph C. Gabriel? A. No, sir. Q. In writing down a name to designate yourself, did you ever write any other name than Joseph C. Gabriel? A. No, sir. Q. Then, I will ask you this: I show you register of the Hotel Bingham of July 6, 1915, more particularly No. 15169, and ask you whether or not the handwriting as follows, 'Mr. and Mrs. J. C. Jackson, New York,' is in your handwriting? A. It is not. Q. I show you the same register, namely, of the Hotel Bingham, under date of July 13, 1915, more particularly No. 15718, and ask you whether or not the writing 'J. C. Jackson and wife, New York,' is in your handwriting? A. It is not. Q. I call your attention to the same register of the Hotel Bingham, under date of July 20, 1915, more particularly No. 16218, and call your attention to the handwriting there, 'Mr. and Mrs. J. C. Jackson, New York City,' and ask you whether or not that is in your handwriting? A. It is not. Q. I call your attention to the same register of the Hotel Bingham, dated July 26, 1915, more particularly No. 16678, and ask you whether the writing 'Mr. and Mrs. J. C. Jackson, New York,' is in your handwriting? A. It is not. Q. You swear to that? A. I do. Q. I show you register of the Hotel Bingham, dated July 1, 1916, more particularly No. 49278, and ask you whether the writing 'G. W. or G. M. Jackson and wife, New York City, New York,' is in your handwriting? A. No, sir. Q. I ask you, on those days, whether or not you were in the Hotel Bingham,

3 D. & C.

at Eleventh and Market Streets, Philadelphia? A. I may have been in the hotel. Q. Did you sleep in that hotel on those nights? A. I did not. Q. You are positive of that? A. I am positive I did not sleep there. Q. Were you at the hotel on those nights with Miss May C. Kelly? A. I was not. . . . Q. Now, Mr. Gabriel, have you ever been known as J. C. Donald? A. No, sir. Q. Have you ever been known as Joseph C. Donald? A. No, sir. . . . Q. Did you ever reside at No. 4832 North Broad Street? A. I did not. . . . Q. Do you know a child by the name of Patricia Cecelia Donald? A. I don't know whether that is her name, but Miss Kelly has a child by that name. Q. Do you know the name of the father of the child? A. I do not. Q. Did you ever hear of Joseph C. Donald being the father of the child? A. No, sir. Q. You never heard that? A. No, sir." And again (pages 242-243) : "Q. While you were living with your wife, did you or not carry on illicit relations with Miss Kelly? A. I did not. Q. At no time? A. At no time. Q. At no place? A. At no place." And again (page 245) : "Q. During your married life, did you commit adultery with Miss Kelly? A. No, sir." And again (page 248) : "Q. You also will testify, as I understand it, that you were never known as Joseph C. Donald? A. No, sir. Q. Is it not a fact that you did live at No. 4832 North Broad Street, Philadelphia? A. No, sir; I did not. Q. You never spent a night there? A. No, sir. Q. You never stayed there over night? A. No, sir. Q. At no time? A. No, sir. Q. Never slept there? A. No, sir."

Notwithstanding these categorical denials by the libellant, the overwhelming weight of the evidence indicates beyond a peradventure of a doubt that the libellant was guilty of nothing less than deliberate falsehood in his answers to the questions above quoted; that in fact he met May C. Kelly in 1913; that he committed adultery with her at the Bingham Hotel in July, 1915, and July, 1916, registering there under the name of J. C. Jackson; that he lived with her at No. 4832 North Broad Street, Philadelphia, for a period of several months both prior and subsequent to the filing of the libel in the present case; that he and she were arrested in April, 1921, on a charge of adultery, and were convicted of that offence in the Court of Quarter Sessions; that the result of their relations was the birth of a child in 1919; and that at the Broad Street residence the libellant went under the name of Joseph C. Donald. There is also testimony given by the witness Robert W. Walls that during the years 1908, 1909 and 1910 the libellant was in the habit, "night after night," of frequenting disreputable houses in company with Walls and there committing adultery. We thus find that the libellant for a considerable period previous to his deserting the marital home was living also with another woman, by whom, as above stated, he had a child born more than a year previous to his leaving his wife. The court is aware of the legal decisions which hold that adultery on the part of a libellant is not a defence to an action in divorce for cruel and barbarous treatment or indignities to the person. It is, however, obviously true that the facts hereinbefore recited are highly important in two other aspects: First, because they seriously and even fatally impeach the credibility of the libellant; and, second, because they show what may well be inferred to be the real motive for his seeking a divorce. It would seem impossible for the court to find the facts in his favor, as the master has done, when we are confronted with the unavoidable conclusion that his testimony is not credible, that in its important phases it is without corroboration, and that it is contradicted not only by the respondent, but by such other persons as were in close relationship with the parties.

In Heckman *v.* Heckman, *supra*, it was said, per Mr. Justice Trexler: "It may not be a fact, but the preponderance of evidence indicates that the libel-

Gabriel *v.* Gabriel.

lant and his stenographer were fond of each other, and gives support to the argument that this action is brought by the libellant, not because there are just grounds for severing their relations, but because he is tired of his wife, wants to get rid of her, or, as she asserts he said to her, desires to have a younger woman." This quotation would seem appropriate to the present case. The respondent is almost four years older than the libellant and is now fifty-two years of age. The libellant left her to live out his life more independently in the other domestic establishment which he had been and was then maintaining. Even in selecting the time for his departure he acted with peculiar lack of delicacy of feeling and of any tender solicitude for his wife and daughter, for he left on the evening of Dec. 24, 1920, which, in addition to being Christmas Eve, was also the twenty-first birthday anniversary of his only legitimate child. It comes with ill-grace from him to seek a divorce, and as the basis of it to pick out disconnected events which occurred throughout the course of a long married life, and which, even if true, would not seem to warrant a decree in his favor. The court, however, prefers to rest its decision refusing a divorce upon the ground that the master erred in finding the facts to be as alleged by the libellant, because, on the contrary, it believes that the allegations made by the latter are not borne out by the weight of the testimony, and that he has not sustained the burden which the law casts upon him to establish his case by evidence of the clear and satisfactory nature requisite in divorce proceedings.

"Courts ought never to sever the marriage contract but where the application is made in sincerity and truth for the causes set forth, and no others, and fully sustained by the testimony:" Forrester *v.* Forrester, 77 Pa. Superior Ct. 364, and cases there cited.

The exceptions are sustained and the libel dismissed.

BARRATT, P. J., and GORDON, J., concur.